*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| MONA J., | ) |
| | ) Supreme Court No. S-18049 |
| Appellant, | ) |
| | ) Superior Court No. 4BE-17-00064 CN |
| v. | ) |
| | ) O P I N I O N |
| STATE OF ALASKA, | ) |
| DEPARTMENT OF HEALTH & | ) No. 7598 – June 10, 2022 |
| SOCIAL SERVICES, OFFICE OF | ) |
| CHILDREN'S SERVICES, | ) |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Bethel, Nathaniel Peters, Judge.

Appearances: Rachel E. Cella, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellant. Kimberly D. Rodgers and David A. Wilkinson, Assistant Attorneys General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

MAASSEN, Justice.

## I. INTRODUCTION

The superior court terminated a mother's parental rights to her two children. Because the children are Indian children as defined by the Indian Child Welfare Act

(ICWA), the Office of Children's Services (OCS) was required to make active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the family before the mother's rights could be terminated. The superior court found clear and convincing evidence that OCS satisfied this requirement, although OCS's efforts were ultimately unsuccessful.

The mother appeals, challenging only the active efforts finding. She asks us to overturn precedent allowing courts to consider a parent's noncooperation and the resulting futility of OCS's actions when determining whether OCS satisfied the active efforts standard. She argues in the alternative that even under existing law the superior court's active efforts finding was erroneous. We agree with the mother that the court erred by stating that active efforts "are dependent on [the mother's] willingness to engage"; the active efforts inquiry depends primarily on OCS's efforts, not the parent's reaction to those efforts. We take this opportunity to clarify the extent to which a parent's noncooperation is relevant to the active efforts analysis. And although we disagree in part with the superior court's approach in this case, we independently conclude that OCS's efforts satisfy the active efforts standard, and we therefore affirm the termination order.

## II.    FACTS AND PROCEEDINGS

### A.    Background And Initial Contact With OCS

Mona is the mother of Anders (born in 2013) and Vera (born in 2015),[1] who are "Indian children" as defined by ICWA.[2] Mona is no longer in a relationship

---

[1]    Pseudonyms are used to protect the family's privacy.

[2]    25 U.S.C. § 1903(4) (defining an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible

(continued...)

with the children's father, Jared, who voluntarily relinquished his parental rights at the termination trial.

OCS first became involved with Mona's family in December 2016, after she repeatedly asked a nonprofit family support center to help her with her children. In January 2017 Mona met with an OCS worker at an Anchorage domestic violence shelter. She explained that she lacked reliable family support in Anchorage, was taking medication for depression and anxiety, and was feeling overwhelmed. Anders had been behaving aggressively, which Mona attributed to his exposure to domestic violence, and Vera had begun copying his misbehavior. OCS offered Mona resources, including a bus pass to help her get to appointments, but Mona declined the offer.

Mona sought OCS's help again the next day, seeking a temporary alternative caregiver for her children. OCS contacted Mona's tribe and the children's paternal grandmother, Ruth, who lived in Bethel, and planned for the children to go to Bethel to temporarily live with Ruth. Before the flight, however, Mona contacted OCS and said she would keep the children with her in Anchorage instead. OCS attempted to contact Mona a few more times that month, but she did not return its calls.

## B. Mona's Initial Assessment

OCS next met with Mona in June 2017 at a Bethel shelter; Mona had just left her village because of a lack of support there. She told the OCS caseworker that she had been using tramadol, a synthetic opioid, for about two years due to stress and had last used it a few days before. The caseworker later testified that during the encounter Mona's children were unruly and "not really listening to [Mona]," and Vera had a bruise

---

[2]     (...continued)
for membership in an Indian tribe and is the biological child of a member of an Indian tribe").

near one eye. Six days later Mona returned a call from the caseworker and, according to the caseworker's later testimony, "didn't feel that she was safe right now for the kids." She also told the caseworker she was pregnant.[3]

The caseworker began looking for a temporary caregiver for Anders and Vera; the caseworker left a voicemail for Jared and spoke with Mona's mother, who declined to take the children. The caseworker then talked to Ruth, who agreed to take the children overnight and again while Mona received an integrated assessment to evaluate any substance abuse and behavioral issues.

Mona's integrated assessment recommended a six-week residential treatment program, which the caseworker encouraged her to attend. Mona initially agreed to participate but then changed her mind; she told OCS that she and the children would return to the village instead.

## C. OCS's Non-Emergency CINA Petition

The caseworker next met with Mona in July after Vera was admitted to the hospital with pneumonia; Anders was living with Jared. OCS filed a non-emergency child-in-need-of-aid (CINA) petition alleging that both children were children in need of aid. The next day, apparently in response to the petition, Mona left an abusive voicemail at OCS, telling the caseworker to leave her and her children alone. The caseworker met with Jared, who told her that Mona now had both children because he and Ruth were frightened of her.

The caseworker met with Mona in late July and texted her a few days later "to see if she needed any assistance"; Mona did not respond.

---

[3] Mona gave birth in late October 2017, and the baby tested positive for tramadol; she arranged for a tribal adoption of the baby.

## D.     The Children's Placement With Jared And Ruth

In August 2017 Mona called the caseworker and asked that OCS take the children into its custody. OCS placed both children with Jared, but Ruth assumed most childcare responsibilities. Mona visited fairly regularly, though according to Ruth the children acted out after her visits.

In mid-October OCS created a case plan for Mona, which she signed. The plan called for her to address her substance abuse issues, attend outpatient services, obtain a behavioral health and substance abuse assessment, and complete a parenting class; Mona testified that she completed the parenting class.

In late October Ruth asked OCS to remove Anders and Vera from her care, and OCS filed an amended emergency petition for CINA adjudication and temporary custody. In early November OCS removed the children from Ruth's home and sent them to live with a foster parent.

In December Mona stipulated that Anders and Vera were children in need of aid due to neglect. The stipulation also outlined a visitation schedule: Once the children were returned to Ruth's home, Mona would have daily phone calls and three two-hour visits a week. Mona was also supposed to obtain an integrated assessment; once she completed any recommended treatment program, overnight visits and a trial home visit could begin. But the stipulation recognized that Mona was living with her boyfriend, Earl, a registered sex offender, and provided that any visits would "depend on an appropriate resolution to the problems presented by the presence of a registered sex offender" in her home.[4]

---

[4]     Mona and Earl continued their relationship throughout the case, and there were a number of domestic violence incidents between them in 2018 and 2019.

### E. OCS's Further Involvement With Mona

The two children were returned to Ruth's care in late 2017 or early 2018. A second OCS caseworker formalized a family contact plan that allowed Mona to visit the children three times a week. Ruth supervised the visits at first, but she later told Mona to schedule them with OCS. Ruth again asked to have the children removed from her home because of Mona's volatility and the children's misbehavior following her visits. OCS placed the children in another home temporarily.

Anders was returned to Ruth's home after about a month, but Ruth felt she could not safely take care of both children because they fought constantly. Vera was placed with a foster parent, Lily, in another village.

Mona participated in an outpatient substance abuse program early in 2018 and believed she had completed that program, though an OCS caseworker later testified that Mona told her she left early. In the spring of 2018 Mona visited the emergency room after overdosing on tramadol. At a follow-up visit she said she used tramadol because of the stress caused by OCS's removal of her children, and she said she worried that healthcare providers were making it more difficult for her to get her children back.

That summer Vera traveled to South Dakota with Lily. Mona moved for a visitation review hearing, asking the court to grant her unsupervised visits with Anders and allow her to see Vera in South Dakota. The court denied these requests but encouraged OCS to work toward unsupervised visits with Anders and to plan a long visit with Vera upon her return to Alaska.

A third OCS worker created a new case plan in September. The plan required Mona to volunteer for school-related activities, participate in traditional cultural activities with her children, and engage in formal counseling as needed. In April 2019 an OCS worker called Mona to schedule a case-planning meeting and offered her a cab

voucher. Mona missed the meeting and did not answer a follow-up call; she called back later that day but did not leave a message when no one answered.

In May a fourth caseworker assumed responsibility for Mona's case. Mona left this caseworker a message asking for an appointment to create a case plan. The caseworker testified that she scheduled an appointment for later in the month and offered Mona cab fare, but she could not recall whether the meeting occurred.

Lily took Vera to South Dakota again in summer 2019. OCS coordinated a trip for Mona to visit Vera there that summer and provided her with a travel itinerary. In June OCS also gave Mona applications for three residential treatment facilities in Anchorage and Fairbanks. When the caseworker asked Mona how she planned to keep her children safe from Earl given his sex-offender status, Mona became emotional; she told the caseworker she was pregnant with Earl's child and would not put the father of her child out of the house.

In July OCS updated the family contact plan due to complaints from both Ruth and Lily about Mona's behavior. Visits with Anders were no longer to take place at Ruth's home, and limits were placed on Mona's contact with Lily. Mona completed another substance abuse assessment, but without the behavioral component that OCS believed should be included.

In late 2019 Mona attended residential treatment in Bethel for three weeks but was medivaced to Anchorage with heart problems and did not complete the program. In November 2019 she gave birth to another child, who remained with her as of the time of trial.

In December the caseworker met with Mona and created a case plan requiring her to undergo behavioral health and substance abuse assessments, complete a psychological evaluation, and find housing apart from Earl. But Mona refused to sign

the case plan or a release of information. OCS nonetheless arranged for her to have a psychological evaluation in Anchorage, including booking flights and providing cab vouchers, and it sent her the itinerary a little over a week in advance. Mona did not respond and the assessment did not occur; Mona contends on appeal that she never agreed to it. Also at this meeting Mona asked that OCS set up a urinalysis schedule for her.[5]

Mona and her attorney met with the caseworker in January 2020. In response to the caseworker's questions, Mona denied knowing any details of Earl's criminal history. OCS invited her to a meeting to discuss medications that had been prescribed for Anders to help with his behavior, but she did not attend, later telling OCS she had lost her bus pass.

In February Mona asked the court to review its disposition order. She said she had been sober for over a year, and although she hoped to find independent housing, "the reality of housing in the region means that people can wait for years to obtain their own housing." She also argued that an "outright ban on contact" between Earl and the children was not feasible. In March Mona asked the court to review the limits on visitation; OCS had just prohibited visits with Anders at school after Mona visited one day without prior authorization and he threw a tantrum.

In April OCS filed a petition to terminate Mona's and Jared's parental rights. In April the court also held a permanency hearing and approved OCS's goal of adoption, and it denied Mona's motions to review the disposition order and visitation. The court also instructed OCS to help Mona find new housing. In response OCS contacted the Alaska Housing Finance Corporation to determine whether Mona was

---

[5]     In March and April of 2020, OCS set up urinalyses for Mona pursuant to this request; she took about ten tests and all were negative.

eligible to apply for its services. The caseworker filled out part of an application, highlighted the sections Mona needed to complete, and dropped the packet off for her; Mona picked the packet up but the superior court found that she did not complete it, which the court attributed to her reluctance to leave Earl.

In May Mona asked OCS whether it could find alternative placement for Vera in Alaska for the summer rather than allowing Lily take her to South Dakota again. OCS contacted Mona's grandmother, but placement with her was not possible because of a household member's disqualifying criminal history. OCS continued to reach out to Mona's family members based on a list Mona provided, but it was unable to find Vera a suitable placement, and it again allowed her to spend the summer in South Dakota with Lily. OCS arranged to fly Mona to Bethel for a visit during Vera's stopover on the way out of state. Mona was already in Bethel, however, because she had taken her baby to the emergency room there. She nonetheless missed the scheduled visit with Vera. She then attempted to intercept Lily and Vera at the airport before they boarded the plane, but OCS refused to allow the meeting to occur because it could not arrange appropriate supervision at the last minute and Mona was in a "very emotional" state.

In June 2020 another caseworker was assigned to the case. He created a new case plan, which Mona refused to sign. The plan required her to obtain a psychological evaluation, complete another parenting class, participate in another substance abuse assessment and follow its recommendations, undergo random urinalysis testing, and end the children's contact with known sexual offenders.

By November the case was reassigned to one of the caseworkers who had had it before. This caseworker had difficulty contacting Mona about visits and eventually, at Mona's request, communicated with her only through her attorney. In February 2021 OCS learned that Vera had been diagnosed with an emotional disorder

and asked Mona to consent to medication. Mona refused; the caseworker responded by asking her to resume case planning and undergo a behavioral health assessment. The next day she sent Mona a letter encouraging her to reengage with OCS.

### F. Termination Trial And Termination Order

The superior court held a trial in March 2021, about a year after the termination petition was filed, and ordered the termination of Mona's parental rights. Among its other necessary findings the court found by clear and convincing evidence that OCS had made active efforts to provide remedial services and rehabilitative programs intended to prevent the breakup of the family, as required by ICWA.[6]

The superior court began its discussion of active efforts by stating that active efforts "are more than reasonable efforts and are dependent on [Mona's] willingness to engage." The court found that Mona "was never willing to engage in an attempt to reunify with her children and actively attempted to frustrate OCS's attempts to provide remedial service[s] and rehabilitative programs at different points throughout the case." The court acknowledged that Mona attended urinalysis tests, always tested negative, participated in some family contacts, and completed some of her case plan requirements. The court also observed, however, that she sometimes actively frustrated family contact and refused to cooperate with most OCS workers. The court wrote: "OCS testified convincingly that OCS offered services to [Mona] over the life of the case" even though "there were times when OCS was more lax in [its] efforts." The court cited OCS's facilitation of regular visits and its efforts to get Mona the proper

---

[6] 25 U.S.C. § 1912(d) ("Any party seeking to effect a . . . termination of parental rights to[] an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.").

assessments, contrasting these efforts with Mona's failure to return calls and texts, her demand that all contact go through her attorney, and her refusal to attend meetings. The court also noted OCS's attempts to encourage alternative housing for Mona and her refusal to move away from Earl.

Mona appeals the termination order, challenging the court's active efforts finding.

## III. STANDARD OF REVIEW

"Whether OCS made active efforts . . . as required by ICWA is a mixed question of law and fact."[7] "We review factual findings for clear error, reversing only if, after 'review of the entire record' . . . we are left 'with a definite and firm conviction that a mistake has been made.' "[8] "Whether the superior court's factual findings . . . satisfy ICWA is a question of law to which we apply our independent judgment."[9] "We 'bear in mind at all times that terminating parental rights is a drastic measure.' "[10]

---

[7] *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 526 (Alaska 2013).

[8] *Ronald H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 490 P.3d 357, 365 (Alaska 2021) (omission in original) (quoting *Jon S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 212 P.3d 756, 761 (Alaska 2009)).

[9] *Id.*

[10] *Jon S.*, 212 P.3d at 761 (quoting *Karrie B. ex rel. Reep v. Catherine J.*, 181 P.3d 177, 184 (Alaska 2008)).

## IV. DISCUSSION

### A. ICWA Requires The State To Make Active Efforts To Provide Remedial Services Designed To Reunite The Family.

ICWA requires that "[b]efore terminating parental rights to an Indian child, a court must find [by clear and convincing evidence] that 'active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.' "[11] The Bureau of Indian Affairs regulations define active efforts as "affirmative, active, thorough, and timely."[12] Active efforts "must involve assisting the parent . . . through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan."[13] The regulations explain:

> To the maximum extent possible, active efforts should be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe and should be conducted in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and Tribe.[14]

Efforts should be "tailored to the facts and circumstances of the case."[15]

---

[11] *Caitlyn E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 399 P.3d 646, 651 n.6, 654 (Alaska 2017) (quoting *Jon S.*, 212 P.3d at 760-61); *see also* 25 U.S.C. § 1912(d); 25 C.F.R. § 23.120(a) (2021); CINA Rule 18(c)(2)(B).

[12] 25 C.F.R. § 23.2 (2021).

[13] *Id.*

[14] *Id.*

[15] *Id.*; *see also Lucy J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 244 P.3d 1099, 1116 (Alaska 2010) (listing active efforts as one of several

(continued...)

However, "the active efforts requirement does not require perfection."[16]  A court's "concern is not with whether [OCS's] efforts were ideal, but with whether they crossed the threshold between passive and active efforts."[17]  We have explained the difference between passive and active efforts as follows:

> Passive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition.  Active efforts . . . [are] where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own.  For instance, rather than requiring that a client find a job, acquire new housing, and terminate a relationship with . . . a boyfriend who is a bad influence, [ICWA] would require that the caseworker help the client develop job and parenting skills necessary to retain custody of her child.[18]

Courts "conduct[] an active efforts inquiry on a case-by-case basis because 'no pat formula' exists for distinguishing between active and passive efforts."[19]  "In determining

[15]     (...continued)
procedural requirements under ICWA) (requiring that OCS "take into account the parents' limitations or disabilities" and " reasonably tailor [the reunification plan] to the client's individual capabilities")).

[16]     *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 272 (Alaska 2011).

[17]     *Id.*

[18]     *A.A. v. State, Div. of Fam. & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999) (quoting CRAIG J. DORSAY, THE INDIAN CHILD WELFARE ACT AND LAWS AFFECTING INDIAN JUVENILES MANUAL 157-58 (1984)).

[19]     *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 527 (Alaska 2013) (quoting *A.A.*, 982 P.2d at 261).

whether OCS made active efforts, the trial court may consider all services provided during the family's involvement with OCS."[20]

B. **Courts May Consider A Parent's Noncooperation When Determining Whether OCS Made Active Efforts, But The Analysis Turns Primarily On OCS's Efforts.**

The superior court began its discussion of active efforts with the statement that "[a]ctive efforts are more than reasonable efforts and are dependent on [Mona]'s willingness to engage," and it extensively discussed Mona's lack of cooperation with OCS. Mona argues that the court's focus on her actions was error; she also asks us to overrule our precedent allowing courts to consider a parent's demonstrated unwillingness to engage with OCS when determining whether OCS's efforts satisfy the ICWA standard. Lack of engagement by a parent, Mona argues, "may demonstrate the requisite efforts were unsuccessful, but it should not be used to excuse OCS's shortcomings." She argues that our precedent "excuses OCS based upon speculation and specious reasoning, undermining ICWA's protections and perpetuating the problems ICWA was designed to counteract." She contends that the superior court applied this so-called "futility doctrine," and she urges us to overturn the doctrine and reverse the termination order in which, she argues, it played a decisive part.

The superior court did overemphasize Mona's behavior when determining whether OCS had made active efforts, and the court erred by stating that active efforts "are dependent on [Mona's] willingness to engage." We now seek to clarify how a court may appropriately consider a parent's actions and unwillingness to cooperate when analyzing whether OCS has made active efforts. Crucially, we emphasize that the

---

[20] *Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 343 P.3d 425, 432 (Alaska 2015).

analysis of active efforts under ICWA turns primarily on OCS's actions, not on the parent's response.

When enacting ICWA in 1978, Congress acknowledged "that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children."[21] Congress found "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions."[22] Congress passed ICWA in an effort to "protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families."[23] The active efforts requirement is an important aspect of these minimum standards.[24]

---

[21] 25 U.S.C. § 1901(3).

[22] 25 U.S.C. § 1901(4). Alaska is no exception to this history. *See* Lex Treinen, *'I thought my name was my number': Survivors recount Alaska boarding school experience,* ALASKA PUB. MEDIA (June 25, 2021), https://www.alaskapublic.org/2021/06/25/confronting-the-legacy-of-boarding-school s-in-alaska-2/; Kortnie Horazdovsky, *Alaska Native elders share boarding school experiences on 'Orange Shirt Day'*, ALASKA'S NEWS SOURCE (Sep. 30, 2021), https://www.alaskasnewssource.com/2021/09/30/alaska-native-elders-share-boarding -school-experiences-orange-shirt-day/.

[23] 25 U.S.C. § 1902.

[24] *See* 25 U.S.C. § 1912(d).

A parent's lack of cooperation or unwillingness to participate in treatment does not excuse OCS from making active efforts and proving that it has made them;[25] we cannot create a judicial exception to ICWA.[26] As we have written before, an active efforts finding must "turn[] on OCS's efforts."[27] That said, a parent's actions have a place in the court's determination of whether OCS's efforts satisfy the ICWA standard.[28] Our prior cases recognize three sometimes-interconnected ways that a parent's unwillingness to cooperate can impact a court's active efforts analysis: (1) it can excuse

---

[25] *See Bill S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 976, 983 (Alaska 2019) ("[T]he parents' lack of effort does not excuse OCS's failure to make and demonstrate its efforts.").

[26] *A.M. v. State*, 891 P.2d 815, 827 (Alaska 1995), *overruled in part on other grounds by In re S.A.*, 912 P.2d 1235, 1241 (Alaska 1996).

[27] *Demetria H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 433 P.3d 1064, 1072 (Alaska 2018).

[28] Federal guidelines leave room for some consideration of a parent's actions when evaluating active efforts. When discussing how long active efforts must be made, the guidelines state:

> [I]f a parent initially refused alcohol treatment despite an agency's active efforts to provide services, a court could find that these efforts satisfied the requirement for purposes of the foster-care placement. But, if the parent subsequently completes alcohol treatment and needs additional services to regain custody (such as parenting skills training), the court will need to consider whether active efforts were made to provide these services.

BUREAU OF INDIAN AFFS., U.S. DEP'T OF THE INTERIOR, GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT 43 (Dec. 2016) [hereinafter BIA GUIDELINES].

*further* active efforts once it is clear those efforts would be futile;[29] (2) it can excuse "minor failures by [OCS]";[30] and (3) it can influence what actions qualify as active efforts.[31]

The first listed use of the doctrine — to excuse further efforts — seems to be what Mona is most concerned with, and we agree that it should be the least frequently invoked. Although there are rare occasions where further active efforts of any type may be excused, OCS must always show that it made active efforts in the first place.[32] And when a parent is unwilling to cooperate or to participate in treatment, OCS's response must be to attempt to overcome that noncooperation.[33] This requires understanding why the parents of Alaska Native and Native American children may be suspicious of OCS and reluctant to cooperate in a case plan.[34] But even courts that have expressly rejected

---

[29]    *See, e.g.*, *Wilson W. v. State, Off. of Child.'s Servs.*, 185 P.3d 94, 97, 101 (Alaska 2008).

[30]    *See, e.g.*, *Ben M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 204 P.3d 1013, 1021 (Alaska 2009).

[31]    *See, e.g.*, *Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 343 P.3d 425, 432-33 (Alaska 2015).

[32]    We do not intend to imply that OCS may determine independently that active efforts are no longer required in a particular case. *Cf.* AS 47.10.086(c)(2)(A) (allowing *a court* to determine that reasonable efforts are not necessary given certain circumstances, such as parent murdering other parent). OCS should assume that active efforts should continue.

[33]    *See* 25 C.F.R. § 23.2 (2021) (requiring child welfare agencies to "help[] the parents to overcome barriers" to reunification).

[34]    The Washington Supreme Court recently wrote:

(continued...)

a futility doctrine have agreed that there is some point at which active efforts can no longer be required.[35] This issue may be subsumed in another rule we apply in the active efforts context: OCS's efforts must be reviewed as a whole, and a failure in one area or for a discrete amount of time will not necessarily bar a finding that OCS satisfied the active efforts standard over the life of the case.[36]

Regarding the second use of the doctrine — when a parent's noncooperation can excuse minor failures by OCS — we emphasize that this extends

---

[34]     (...continued)
A parent's inability or unwillingness to engage with the [State] may be attributed to many factors, such as cultural differences, poverty, or generational trauma. It may also be related to the reasons for the dependency petition and ensuing case. Excusing the [State's] burden to engage in active efforts based on a parent's lack of engagement would impermissibly harm Native families who are experiencing poverty or other issues that often fall under the rubric of "neglect." While poverty alone is not a sufficient basis for dependency or termination, it has historically been used as justification to remove Native children . . . .

*In re Dependency of G.J.A.*, 489 P.3d 631, 649 (Wash. 2021). "In addition, generational trauma has instilled a deep sense of distrust of government workers in Native communities." *Id.*

[35]     *Id.* at 635 ("The [State] is not excused from providing active efforts unless it can demonstrate to the court it has made sufficient efforts and those efforts 'have proved unsuccessful.' " (quoting 25 U.S.C. § 1912(d)); *In re JL*, 770 N.W.2d 853, 867 (Mich. 2009) ("The ICWA obviously does not require the provision of *endless* active efforts, so there comes a time when the [State] or the tribe may justifiably pursue termination without providing additional services." (emphasis in original)).

[36]     *Walker E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 480 P.3d 598, 607-08 (Alaska 2021).

only to *minor* failures that are connected to the parent's lack of cooperation. Lack of cooperation does not excuse major failures by OCS or minor OCS failures unrelated to the parent's behavior. This use of the doctrine may also be subsumed in the rule that we view OCS's efforts as a whole.[37]

The third use of the doctrine involves the most common way that a parent's actions may feature in an active efforts analysis: how OCS's efforts should respond to a parent's noncooperation. ICWA requires that active efforts "be tailored to the facts and circumstances of the case";[38] these circumstances include a parent's negative reaction to OCS's attempts at rehabilitation and reunification. When a parent is unwilling to cooperate and OCS merely persists in the same actions it would have taken with a cooperative parent, OCS may be failing to engage in active efforts by not adjusting to the circumstances of the case. A fairly wide spectrum of behavior may be classified as "noncooperation" or a "lack of willingness to participate." This can range from a refusal to participate in treatment to threats to harm OCS employees.[39] Certainly different behaviors, and motivations, require different adjustments from OCS.[40]

---

[37] *Id.*

[38] 25 C.F.R. § 23.2.

[39] *See, e.g.*, *K.N. v. State*, 856 P.2d 468, 471-72, 477 (Alaska 1993) (parent refused to submit to psychological evaluation without court order or to follow steps of treatment plan); *Wilson W. v. State, Off. of Child.'s Servs.*, 185 P.3d 94, 97, 101-02 (Alaska 2008) (parent threatened to kill OCS workers).

[40] For example, if a parent refuses to undergo substance abuse treatment, OCS should seek to understand the reasons for that refusal and address them. A refusal based on a fear of confinement would require a different response than a refusal based on the parent's conviction that there is no substance abuse problem in the first place.

As Mona contends, some of our past cases have suggested that OCS passivity may be justified by a parent's unwillingness to cooperate. In *A.A. v. State, Department of Family & Youth Services*,[41] we wrote that "although the State's efforts in relation to [a parent] may have been relatively passive, [the parent] demonstrated a lack of willingness to participate in treatment" and therefore the requirements of ICWA were met.[42] And in *Ronald H. v. State, Department of Health & Social Services, Office of Children's Services*,[43] we wrote that a parent's noncooperation "is particularly relevant when efforts become passive due to lack of cooperation from the parent."[44] These cases do not obviate OCS's responsibility to make active efforts and to modify those efforts as necessary in response to a parent's lack of cooperation. To be clear, a lack of cooperation does not justify a decision to make only passive efforts. OCS always has an obligation to make active efforts, regardless of whether a parent cooperates. Our prior statements should be understood as a recognition that a parent's noncooperation with OCS will necessarily affect the kinds of efforts OCS is able to make toward reunification

---

[41]     982 P.2d 256 (Alaska 1999).

[42]     *Id.* at 262. At oral argument, Mona highlighted *A.A.* as a particularly problematic fact pattern. In *A.A.* we affirmed a finding of active efforts even though OCS had not even made a case plan. *Id.* Without saying we would reach the same result today, we take note of complicating factors in *A.A.* such as the father's incarceration and the length of his sentence. We wrote: " 'While [n]either incarceration nor doubtful prospects for rehabilitation will relieve the State of its duty under ICWA to make active remedial efforts,' the practical circumstances surrounding a parent's incarceration . . . may have a direct bearing on what active remedial efforts are possible." *Id.* at 261 (first alteration in original) (quoting *A.M. v. State*, 891 P.2d 815, 827 (Alaska 1995), *overruled in part on other grounds by In re S.A.*, 912 P.2d 1235, 1241 (Alaska 1996)) .

[43]     490 P.3d 357 (Alaska 2021).

[44]     *Id.* at 366.

and in that way affects a court's analysis of whether OCS has satisfied its active efforts burden.

Mona suggested at oral argument that we require trial courts to conduct substantive review of ongoing active efforts at regular points throughout CINA proceedings and collaborate with OCS, the parent, and other parties on identifying possible next steps. The federal regulations do not impose such a requirement,[45] although federal guidelines do make note of "a recommended practice for a court to inquire about active efforts at every court hearing and actively monitor compliance with the active efforts requirement."[46] We add our support to this recommendation as good practice while not making it a requirement at this time. We note that it is particularly difficult to assess active efforts retrospectively over a period of many years, and an approach involving more regular review would increase the likelihood that problems can be timely resolved and disagreements mitigated — goals all parties should share.

Finally, we note that in asking us to overrule our own precedent, Mona points to *In re Dependency of G.J.A.*, in which the Washington Supreme Court recently rejected its state's version of a futility doctrine as applied in ICWA cases.[47] This "judicially created" futility doctrine excused the State "from providing services if the services would have been futile or would not remedy the parental deficiencies within the

---

[45] *See* 25 C.F.R. § 23.120 (2021) (requiring only that a court ascertain that active efforts have been made "[p]rior to ordering an involuntary foster-care placement or termination of parental rights").

[46] BIA GUIDELINES, *supra* note 28, at 43.

[47] 489 P.3d 631, 635 (Wash. 2021).

child's foreseeable future," even if active efforts had not already been provided.[48] This is not the law in Alaska, and we explicitly reject such a doctrine today. OCS's duty to make active efforts under ICWA cannot vary "based on subjective, pre-intervention criteria such as a parent's motivation or treatment prognosis."[49]

## C. In This Case OCS Made Active Efforts As Required By ICWA.

Despite our concern with the superior court's statement of the law governing active efforts, we do agree with its conclusion that OCS demonstrated and proved by clear and convincing evidence its active efforts to reunite Mona with her children.

OCS's active efforts included providing Mona bus passes and cab vouchers; coordinating with Ruth to temporarily care for the children in early 2017 and again that summer; speaking with Mona's care provider about her 2017 integrated assessment and encouraging her to follow the provider's recommendation for inpatient treatment; scheduling another assessment for her and communicating with the care provider; creating several case plans for her; arranging for Mona to receive a psychological assessment in Anchorage, including making the appointment, coordinating Mona's flights, and preparing cab vouchers for her; supplying Mona with applications for multiple treatment facilities; encouraging her to live separately from Earl so that her children could live with her safely; involving Mona's tribe; contacting the Alaska Housing Finance Corporation to see whether Mona was eligible for its services;

---

[48]     *Id.* at 648-49.

[49]     *A.M. v. State*, 891 P.2d 815, 827 (Alaska 1995), *overruled in part on other grounds by In re S.A.*, 912 P.2d 1235, 1241 (Alaska 1996). OCS agrees in its briefing that "the noncooperation rule does not absolve OCS from making and documenting active efforts even when the likelihood of success is bleak."

completing part of a housing application for Mona and giving her the rest of the application to complete; offering urinalysis testing; enrolling Anders in behavioral health services; ensuring that Vera could receive play therapy while in South Dakota; and contacting members of Mona's extended family while seeking an alternative placement for Vera.

Throughout the case OCS facilitated visitation between Mona and her children, including in-person, telephonic, and video visits. Many visits required OCS to coordinate flights between outlying villages and Bethel and between Bethel and South Dakota. OCS provided Mona with cab vouchers, bus passes, and offers of rides to help her attend visits; arranged for her to visit Anders at school during lunch times and recess; and scheduled children's birthday celebrations to accommodate her attendance and preferences. Visitation was complicated by OCS's difficulty reaching Mona at times, but the caseworkers generally worked to accommodate her.

OCS continued with its efforts despite Mona's lack of consistent cooperation. Early in the case Mona sought out OCS's support on occasion and voluntarily shared information about her circumstances and needs. But she expressed her mistrust of many people. After OCS filed a petition for custody, Mona left a caseworker an obscene voicemail telling her to leave her children alone, which the superior court labeled as the start of Mona's "unending antagonism and hostility towards OCS." She was at times combative in her communication with her caseworkers as the case went on. She hung up on one caseworker on occasion and refused to let another into her home. For a while she refused to speak with anyone from OCS and would communicate with them only through her attorney, even about visitation. She asked that certain OCS workers not be allowed to supervise her visits. She attempted to skirt OCS's visitation rules, particularly with regard to the children's contact with Earl, which

she sometimes allowed and encouraged. But OCS did not stop making efforts as a result of this behavior. For example, it complied with Mona's request to communicate only through her attorney, and it encouraged her to restart case planning after she stopped. In sum, this case is an example not of OCS stopping active efforts in the face of a parent's noncooperation but of OCS persisting despite resistence and changing course when necessary.

OCS's efforts were not perfect. Although a number of different OCS workers were assigned to Mona's case over its more than four-year duration, there were very few, if any, case transfer meetings. OCS mismanaged at least one court-directed visitation and did not provide consistent urinalysis testing. It did not help Mona look for housing until several years into her case (as is further discussed below). But perfection is not the standard, and we conclude that OCS's efforts qualify as "affirmative, active, thorough, and timely."[50]

### 1. Failure to refer Mona for a neuropsychological examination

Mona argues that OCS's efforts were not active because they were not adequately tailored to her known disabilities — specifically a traumatic brain injury that she says should have prompted OCS to refer her for a neuropsychological exam early in the case. Mona cites the trial testimony of OCS expert Philip Kaufman, who called her "a very, very challenged woman who's got lots going on that needs to be evaluated that hasn't been evaluated," and notes that her "records established she had suffered a traumatic brain injury during an ATV accident." Mona argues that "it should have been equally clear to OCS that it needed to adjust its strategies in working with her," and a referral to neuropsychological testing early in the case — when she was still interested

---

[50]     25 C.F.R. § 23.2 (2021).

in working with OCS — "could have helped OCS identify appropriate ways of interacting with [her] and set the case on a different path."

But we agree with OCS that "the lack of such an evaluation does not negate the . . . active efforts that OCS did make in trying to address Mona's mental health and other needs." Kaufman's testimony about the traumatic brain injury — the only mention of it at the termination trial — provided no details; he did not know how recent it was, although he did conclude that Mona's "disabilities, whatever they may be, have impeded [her] from making the progress necessary . . . for her to . . . be a safe parent." Mona did not bring up her brain injury or alleged resulting disability at trial, and the court did not mention it in its order terminating her parental rights. Given the limited evidence of this alleged disability, we cannot conclude that OCS's failure to refer Mona for a neuropsychological exam was fatal to the success of its efforts.[51]

### 2.       Failure to help Mona find independent housing

Mona argues that OCS knew as early as 2017 that she needed independent housing and was not interested in residential treatment, but it still did not begin helping her look for housing until 2020, after the court specifically required it. Mona was in a shelter when OCS first met with her in 2016; a year later OCS knew that she was living with Earl. OCS argues that it initially chose to prioritize Mona's "need for residential substance abuse treatment that would have also addressed her immediate need for safe housing." In summer 2017, OCS encouraged Mona to enroll in a six-week residential treatment program. She decided against this and told OCS she would return to her

---

[51]       We also note that later in the case OCS did refer Mona for a psychological exam, made the appointment, purchased plane tickets, and prepared cab vouchers. Mona did not attend the appointment.

village instead. Although she did not immediately pursue that treatment option, there was evidence that she participated in residential treatment at times at least through late 2019.

OCS claims that its 2020 offer of housing assistance was "timely . . . because the help was provided when Mona finally expressed an interest in leaving" Earl. In February 2020 Mona argued in a court filing that she would not be able to find independent housing, indicating some possible interest in living separately from Earl; two months later (at the superior court's directive) OCS started a housing application for her. Under the circumstances, we do not believe that OCS's failure to prioritize independent housing earlier in the case negates an active efforts finding. Mona had repeatedly said she did not want to leave Earl; she became emotional when the caseworker brought up the subject and refused to sign a case plan that required it. We conclude that OCS's failure to find independent housing for Mona does not foreclose a finding that OCS made active efforts in this case.

### 3. Failure to notify Mona of the dangers Earl presented

Mona also argues that OCS "waited until the termination trial to convey the full scope of concerns about [Earl] to" her and did not do enough beforehand to inform her about his history and encourage her to leave the relationship. She claims that before the termination trial she was not aware of the extent of Earl's criminal past. OCS responds that "the record reflects that Mona knew [Earl] was dangerous, and OCS could have done little more under the circumstances." OCS cites trial testimony indicating that

Earl had assaulted Mona more than once and that OCS warned her about him repeatedly.[52]

We agree with OCS's view of this issue. Significantly, Mona signed a stipulation in December 2017 that acknowledged she lived with a convicted sex offender and that this was a barrier to reunification. But the evidence well supported a conclusion that she was unwilling to deal with the issue despite OCS's repeated efforts to resolve it. OCS workers testified at trial that they asked Mona about her relationship with Earl several times over the life of the case and each time she was not willing to have that discussion. In June 2019 a caseworker met with Mona outside her home and "asked her how she planned to protect her son and daughter from a child sex offender if she was going to have him living in the home." Mona became emotional, telling the caseworker that she was pregnant and not willing to put the father of her child out of the house. In a December 2019 meeting, a caseworker again told Mona she needed to find housing away from Earl so that her children would not be exposed to a child sex offender if they were to live with her. When the caseworker asked Mona what she knew about Earl's

---

[52] OCS also cites earlier proceedings, including detailed testimony from Earl himself about his crimes, and alleges that Mona lied to OCS in 2020 when she told a caseworker she no longer lived with him. The admissibility of this testimony, along with that of other testimony and exhibits from proceedings that preceded the termination trial, is at issue in this case; Mona argues that we cannot consider it and OCS argues that it is part of the record. Because this evidence was not properly admitted at trial, we do not consider it. *Bill S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 976, 983 n.32 (Alaska 2019); *see also Chloe O. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 309 P.3d 850, 856 (Alaska 2013) ("On appeal, we review a trial court's decision in light of the evidence presented to that court."); *Paula E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 276 P.3d 422, 430 (Alaska 2012) ("[W]e will consider only the evidence that was admitted at the hearing.").

criminal history, Mona said she had never asked him anything about it. The caseworker raised the issue again in January 2020, and Mona said "she had never asked him about it, no one has ever told her anything about it, and the only thing that she knew was what she heard in court." The caseworker testified at trial that when she then tried to ask whether Mona was curious about what had happened, Mona's attorney cut her off and stopped Mona from answering. There was also testimony that OCS barred Earl from having contact with the children, a rule Mona repeatedly violated. Given all this, it was reasonable for OCS to assume that Mona was aware at least of Earl's status as a child sex offender, if not of the exact details of his past crimes, and knew that her continued relationship with him presented a barrier to reunification; OCS repeatedly tried to raise the issue with Mona while continuing to provide her with services and visitation. Its efforts are sufficient to constitute active efforts under ICWA.

## V.    CONCLUSION

We AFFIRM the order terminating Mona's parental rights.