NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

|  |  |  |
|---|---|---|
| ROGER S., | ) | |
| | ) | Supreme Court No. S-19347 |
| Appellant, | ) | |
| | ) | Superior Court Nos. 3AN-22-00317/ |
| v. | ) | 00318 CN |
| | ) | |
| STATE OF ALASKA, DEPARTMENT | ) | MEMORANDUM OPINION |
| OF FAMILY & COMMUNITY | ) | AND JUDGMENT* |
| SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, | ) | No. 2110 – October 8, 2025 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Ian Wheeles, Judge.

Appearances: Julia Bedell, Assistant Public Defender, and Terence Haas, Public Defender, Anchorage, for Appellant. Kimberly D. Rogers, Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Appellee. Paul F. McDermott, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian ad Litem.

Before: Carney, Chief Justice, and Borghesan, Henderson, Pate, and Oravec, Justices.

---

\*      Entered under Alaska Appellate Rule 214.

# I. INTRODUCTION

A father appeals the termination of his parental rights. He argues that the Office of Children's Services (OCS) failed to make active efforts to prevent the breakup of his family, as required by the Indian Child Welfare Act (ICWA). Specifically, he contends that OCS failed to make active efforts because it did not provide him grief counseling or other mental health support after the deaths first of his children's mother and then of his girlfriend. We disagree and affirm the termination order.

# II. FACTS AND PROCEEDINGS

## A. Facts

In August 2022, OCS received a report of domestic violence and alcohol abuse in the home of Roger S. and Tove G., who are the parents of two children.[1] After an investigation, the agency took emergency custody of the children and filed a petition for temporary custody. Roger Jr. and Wiley are Indian children within the meaning of ICWA.[2] The parents stipulated to probable cause that the children were in need of aid, and the superior court granted OCS temporary custody. The children were placed in foster care.

Roger and OCS developed his first case plan in November. The plan recommended an integrated assessment, parenting and healthy relationship classes, AA meetings, and visitation with his children. OCS provided referrals for the assessment, parenting classes, and AA meetings. Roger and OCS updated his plan in January 2023, adding a referral for parenting support and setting up weekly urinalysis (UA). OCS later reported that Roger was engaged in his case plan at this time: he completed two substance abuse assessments and an integrated one which included a mental health

---

[1] We use pseudonyms for all family members.

[2] *See* 25 U.S.C. § 1903(4) (" 'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.").

assessment, provided a UA, began taking parenting classes, and had weekly visits with his children.

By March, however, Roger stopped attending the parenting classes. Then Tove died in early April 2023. About a month later, a new caseworker was assigned to the case. At trial, the caseworker agreed that Roger expressed "some difficulties" with Tove's death, but she testified that he "appeared motivated" and was "fairly engaged" with his services.

Roger did not attend the adjudication trial in June. The court found that the children were in need of aid due to risk of substantial physical harm and mental injury, neglect, and substance abuse.[3]

In July, the caseworker reported that Roger made "some progress": he started a new job, got a new apartment, kept in contact with OCS, and participated in visits with the children and AA meetings. But he also was not keeping his weekly UA appointments or attending the parenting classes. The caseworker met with him to revise his case plan for a second time and did not include mention of Tove's death. Roger subsequently resumed the parenting classes and provided a UA.

Roger's participation began to drop off after July. He stopped attending the parenting class and the weekly UAs. Between August and October, he was involved in three domestic violence incidents, one of which resulted in his arrest for assault and harassment. In late October, OCS received a report alleging that Roger used methamphetamine during a visit with the children. OCS asked him to provide a hair follicle test and UA; he agreed to, but never did. OCS also tested both children, one of whom tested positive for methamphetamine.

After that, OCS lost contact with Roger. The caseworker attempted to reach him by phone, text, or email multiple times a month but without success. She

---

[3] *See* AS 47.10.011(6), (8)-(10).

also contacted his attorney, sent him a certified letter, monitored VINElink and CourtView,[4] and even attended a court hearing in his assault case, but neither Roger nor his attorney were there.

## B. Proceedings

OCS petitioned to terminate Roger's parental rights in June 2024. It alleged that he had stopped communicating with OCS after the reported methamphetamine use in October 2023 and attended only two in-person visits with his children in the previous nine months. During that time, the caseworker continued trying to contact him but received no response.

In mid-July, OCS reached Roger for the first time since October 2023, when he answered the caseworker's phone call "out of the blue". He informed the caseworker that he was "extremely depressed" after his pregnant girlfriend had been killed. During the phone call, the caseworker scheduled a visit with Roger for two days later and suggested that he see someone to help him with his grief. Roger did not attend the visit or contact OCS again. The case was reassigned to a new caseworker in August. The new caseworker continued to attempt to contact him in person and by phone, text, and email several times a month without success.

Roger did not attend the termination trial in December 2024, although he had previously confirmed to the court that he was aware of the date. OCS called several witnesses, including an OCS investigator, two OCS caseworkers, and a member of the children's foster family. The children's tribe and the guardian ad litem both supported termination of parental rights.

---

[4] VINElink is an online program that allows users to find an inmate's custody status and set up alerts to notify of changes in custody status. *See* VINE, https://www.vinelink.com/ (last visited Aug. 22, 2025). CourtView is the trial courts' case management system. *See Trial Courts*, ALASKA CT. SYS., https://courts.alaska.gov/trialcourts/index.htm (last visited Aug. 22, 2025).

The court terminated Roger's parental rights. It first found by clear and convincing evidence that the children were in need of aid due to abandonment, mental injury, and substance abuse.[5] The court next determined that Roger failed to remedy his conduct placing the children at risk. It found by clear and convincing evidence that OCS made active efforts to provide remedial services to prevent the breakup of the family and those efforts were not successful. Roger, it found, "ceased participation in all programs" after July 2023. And despite "reasonable efforts to locate and communicate with [him]," it found that OCS was "unable to meaningfully engage [him] since October 2023," except for the "single brief unproductive phone call in July 2024." The court rejected Roger's argument that OCS should have referred him to grief counseling after the July 2024 call, noting that his caseworker testified that she had suggested he "see someone (such as a therapist) for what he was feeling."

Roger appeals, arguing that OCS failed to make active efforts because it did not specifically refer him for grief counseling.

## III. STANDARD OF REVIEW

Whether OCS made active efforts as required by ICWA is a mixed question of law and fact.[6] "We review factual findings for clear error, reversing only if, after 'review of the entire record' . . . we are left 'with a definite and firm conviction that a mistake has been made.' "[7] But whether those factual findings "satisfy ICWA is a question of law to which we apply our independent judgment."[8]

---

[5]   *See* AS 47.10.011(1), (8), (10).

[6]   *Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 560 (Alaska 2022).

[7]   *Id.* (omission in original) (quoting *Ronald H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 490 P.3d 357, 365 (Alaska 2021)).

[8]   *Id.* (quoting *Ronald H.*, 490 P.3d at 365).

## IV.   DISCUSSION

The sole question presented on appeal is whether the superior court erred by finding that OCS made active efforts to prevent the breakup of Roger's family. ICWA and Alaska law require that the party seeking termination of parental rights to an Indian child must demonstrate by clear and convincing evidence that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[9]   Federal regulation defines active efforts as "affirmative, active, thorough, and timely" and requires OCS to "assist[] the parent . . . through the steps of a case plan and with accessing or developing the resources necessary to satisfy [it]."[10] Whether OCS's actions meet the active efforts standard is a case by case inquiry; there is " 'no pat formula' . . . for distinguishing between active and passive efforts."[11] Efforts must be "tailored to the facts and circumstances of the case," but they do not have to be perfect.[12]

Roger argues that OCS failed to make active efforts because it did not provide him with grief counseling or other mental health support after Tove and his girlfriend died. He was "clearly affected" by their deaths, he contends, and OCS knew it — but it did not update his case plan after either death. By neglecting to address his grief through specialized counseling, he asserts, OCS failed to tailor its services to his needs.

---

**9**      25 U.S.C. § 1912(d); CINA Rule 18(c)(2); *see also* 25 C.F.R. § 23.120 (2025).

**10**      25 C.F.R. § 23.2 (2025).

**11**      *O'Brien v. Delaplain*, 556 P.3d 1170, 1186 (Alaska 2024) (quoting *Mona J.*, 511 P.3d at 561).

**12**      *Id.* at 1187 (quoting 25 C.F.R. § 23.2 (2025)).

But we view active efforts "in [their] entirety."[13] The lack of grief counseling does not negate the active efforts that OCS made to address Roger's other needs. The court found that OCS made active efforts by meeting with Roger multiple times to develop his case plan; walking him through the case plan; referring him to parenting classes, drug assessments and treatment, healthy relationship classes, and AA meetings; and making numerous and varied attempts to locate him when he fell out of touch. OCS also referred Roger for a domestic violence assessment and facilitated visits with his children. And it went to herculean lengths to contact Roger when he disappeared. Two successive caseworkers testified that they called, texted, or emailed him multiple times a month, confirmed his phone number with the children's foster parents, emailed his attorney, sent him photos of the children, mailed a certified letter, checked VINElink and CourtView, contacted his relatives, looked for him in homeless shelters, and even attended a court hearing in a different case of his. Roger never responded except for the phone call that he answered "out of the blue" in July 2024. And during that call, the caseworker recommended that he "see someone" after he disclosed that his girlfriend also died.

The record demonstrates that OCS's efforts were limited by Roger's disappearance. "A parent's lack of cooperation or unwillingness to participate in treatment does not excuse OCS from making active efforts," but his noncooperation "can excuse 'minor failures'" and "influence what actions qualify as active efforts."[14] Because Roger stopped communicating with OCS, it had no way of knowing that he needed grief counseling. In the months following Tove's death, the caseworker acknowledged that he "express[ed] some difficulties" as a result, but did not indicate

---

[13] *Id.* at 1187 (alteration in original) (quoting *Denny M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 365 P.3d 345, 350 (Alaska 2016)).

[14] *Mona J.*, 511 P.3d at 562-63 (quoting *Ben M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 204 P.3d 1013, 1021 (Alaska 2009)).

that he needed grief support, and was still actively working on his case plan. When he stopped attending classes and appointments months later, OCS attempted — unsuccessfully — to reengage him through consistent and varied outreach. It also recommended that he complete a new integrated assessment, which would have included a mental health evaluation, and scheduled a meeting when it learned that his girlfriend had died. But Roger did not respond to OCS's outreach, did not participate in the new assessment, and did not attend the follow-up meeting. His own noncooperation stymied OCS's efforts. Given Roger's chronic lack of communication and the "evident futility"[15] of OCS's attempts to reach him, the failure to specifically refer him to grief counseling does not negate OCS's active efforts.[16]

## V. CONCLUSION

We AFFIRM the order terminating Roger's parental rights.

---

[15] *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 272 (Alaska 2011).

[16] *See Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 343 P.3d 425, 430, 433 (Alaska 2015) (affirming active efforts finding because mother's disappearance three months after assessment "stymied" OCS's remedial services); *cf. Mona J.*, 511 P.3d 553 (holding failure to refer mother to mental health assessment did not undermine active efforts).