NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

DRAKE S., )
         ) Supreme Court Nos. S-18459/18469
          Appellant, ) (Consolidated)
         )
       v. ) Superior Court Nos. 4FA-21-00169
         ) CN/3VA-20-00001 CN
STATE OF ALASKA, DEPARTMENT )
OF HEALTH & SOCIAL SERVICES, ) MEMORANDUM OPINION
OFFICE OF CHILDREN'S ) AND JUDGMENT*
SERVICES, and BEAVER VILLAGE, )
         Appellees. ) No. 1964 – May 10, 2023
_____ )
         )
KATIE T., )
         )
          Appellant, )
         )
       v. )
         )
STATE OF ALASKA, DEPARTMENT )
OF HEALTH & SOCIAL SERVICES, )
OFFICE OF CHILDREN'S )
SERVICES, and BEAVER VILLAGE, )
         Appellees. )
_____ )

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Thomas I. Temple, Judge.

---

\*      Entered under Alaska Appellate Rule 214.

Appearances: Rachel Cella, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellant Drake S. Olena Kalytiak Davis, Anchorage, for Appellant Katie T. Aisha Tinker Bray, Assistant Attorney General, Fairbanks, and Treg R. Taylor, Attorney General, Juneau, for Appellee State of Alaska. Pearl E. Pickett, Alaska Legal Services Corporation, Anchorage, for Appellee Beaver Village.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

## I.     INTRODUCTION

This Child in Need of Aid (CINA) case concerns two young parents whose son, an Indian child as defined by the Indian Child Welfare Act (ICWA), was removed from their care following allegations of domestic violence. The only issue before us is whether the superior court erred when, following an evidentiary hearing at the disposition stage, it concluded that the Office of Children's Services (OCS) had made active efforts to reunify the family. Both parents appealed. In a summary disposition we reversed the court's active efforts finding and remanded the case for further proceedings. This opinion explains our reasoning.

The parents and the mother's tribe argue that the disposition order placed undue emphasis on the parents' lack of cooperation and erred by crediting OCS with active efforts that were not supported by the evidence. We agree. OCS does not dispute that the active efforts standard was not met for the first year of custody, and we conclude that its efforts after that were not sufficient to make up for the deficiency. Most significantly, after the parents moved from Valdez to the Interior, OCS failed to revise the parents' case plans to reflect their changed circumstances and incorporate available community resources. We also conclude that OCS failed to diligently seek relative placements or meaningfully involve the Tribe in case planning and the provision of

services. Finally, we conclude that the disposition order focused too much on the parents' failures rather than OCS's efforts to engage them.

## II.    FACTS AND PROCEEDINGS

### A.    Background And Initial Contact With OCS

Katie and Drake are the parents of three-year-old Jeb,[1] an Indian child for purposes of ICWA.[2] Katie had been in foster care herself; at the time of Jeb's birth both parents were in their late teens and Katie had been out of the foster care system for less than six months.

OCS first became involved with the family in April 2020, when Jeb was a month old, following two separate reports of neglect and domestic violence between the parents. OCS attempted to send a caseworker to the village where it believed the parents were living but was unable to arrange air travel. OCS then learned that Katie and Jeb had moved to a hotel in Fairbanks. An OCS caseworker met them there, investigated the protective services reports, and advised Katie about relevant resources, including a women's shelter and a counseling service. OCS learned that Drake was living in Valdez, where he had begun anger management classes. Though substantiating allegations of neglect, OCS took no removal actions at that time.

Katie and Jeb later moved to Valdez. In July OCS received two more reports of domestic violence between the parents and concerns about their mental wellbeing. Drake was arrested following the first incident for violating a no-contact order, released, then arrested again following the second incident, again for violating the no-contact order. An OCS caseworker contacted the family, and the investigation

---

[1]    We use pseudonyms to protect the family members' privacy.

[2]    25 U.S.C. § 1903(4) (defining "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe").

prompted OCS to file a non-emergency petition for temporary custody in August. The petition alleged that Jeb was a child in need of aid under AS 47.10.011(2) (incarcerated parent), (6) (physical harm or substantial risk of physical harm), (8) (mental injury or substantial risk of mental injury), (9) (neglect), and (11) (parental mental illness).

Following a hearing, the Valdez superior court awarded temporary custody to OCS, which placed Jeb first with a relative and a few days later with a licensed Indian foster home. Katie's Tribe intervened, and the court found it to be Jeb's tribe for purposes of ICWA.[3] The Tribe searched for relative placements but considered only one a possibility, ultimately deeming it inappropriate. As of the disposition hearing, Jeb remained with the licensed Indian foster home in Valdez.

In October 2020 an OCS caseworker created a case plan with Katie that required her to engage in weekly therapy, complete a psychiatric assessment, sign and maintain current releases of information for OCS and all service providers, engage in substance abuse counseling and classes, contact OCS each weekday about providing a urinalysis (UA), abstain from alcohol and drugs, report any relapses, engage in parenting classes in Valdez, and learn and practice parenting techniques. OCS also created a case plan with Drake, but his was not discussed in any detail at the hearing or admitted into evidence.

At this time Katie was living on her own in Valdez, working at a hotel, and complying with the UA regimen required by her case plan. She asked OCS to arrange a trial home visit, but OCS required that she first complete parenting classes in accordance with her case plan. Drake was no longer incarcerated. Both parents had in-person visits with Jeb.

---

[3]     *See id.* § 1903(5).

**B. Katie and Drake Move From Valdez To The Interior.**

In February 2021 Katie moved back to her village to be closer to her family and in hopes that Jeb would join her there. Drake moved to Fairbanks to be closer to Katie, who by that time was pregnant with their second child, Hattie; Hattie was born in July. That summer Drake moved to the village as well, though he and Katie continued to live apart. Both parents testified that they expected OCS to conduct a home inspection and then arrange a trial home visit around this time, but these things did not happen, at least in part because the parents had not yet completed the parenting classes that OCS considered a prerequisite. Drake testified that while in the village he tried to continue the services described in his case plan but found it challenging because of limited internet access.

**C. After A Year Of OCS Involvement, The Parties Stipulate That Active Efforts Have Not Yet Been Made.**

In August 2021 the parties stipulated that active efforts had not yet been made, and venue of the CINA case was transferred from Valdez to Fairbanks to facilitate the provision of local services. But OCS staffing issues meant that the case was not assigned to a Fairbanks caseworker. The Fairbanks superior court held a status hearing in October, at which the parties agreed to set a disposition hearing four to five months out to allow OCS time to improve its reunification efforts.

Meanwhile, the parents continued to have scheduled visits with Jeb by videoconference, often twice weekly. They also continued with virtual parenting classes, though their attendance was inconsistent, at least partially due to poor internet access. Katie also testified that the classes made her uncomfortable because they were intended for parents with their babies, and, not having custody of Jeb, she had to attend alone. Katie instead attended a few classes at a Fairbanks resource center suggested to her by her tribe's first chief. By December 2021 Drake had moved to North Pole. He began missing many of his scheduled video visits with Jeb, which he blamed on

continued issues with cell phone and internet service. Katie's virtual visits with Jeb dropped off around this time as well.

### D. A New Primary Caseworker Is Assigned.

A new primary caseworker was assigned in December 2021. Based in Wasilla, he typically handled cases out of Valdez, Cordova, Dillingham, and the Aleutian Islands. He testified at the hearing that although he had met Jeb he had never met the parents in person, and he conceded that he was not as familiar with the resources available in the Fairbanks area as he was "with the ones in Wasilla or [his] other working areas."

The caseworker testified that the primary problem with active efforts before August 2021, as he understood it, was a lack of communication. But after he assumed responsibility for the case he established contact with the family by phone and email, revived telephonic visitation, evaluated the parents' progress with their parenting classes, and planned to schedule in-person visits with Jeb in Valdez once the parents completed the parenting classes. Although the caseworker conducted case plan evaluations with the parents in January 2022, he did not actually update their case plans, instead continuing to work with the 2020 plans that had been created when the parents were living in Valdez. The caseworker contacted Drake's Valdez counselor, who informed him that Drake's engagement had been sporadic and had recently stopped altogether. The caseworker attempted to arrange an in-person visit to the village "to do an evaluation of the home to determine the level of safety and progress," but the plan never developed past the stage of checking flight schedules.

### E. OCS Is Involved With The Parents' Second Child.

By February 2022 Drake had moved back to the village. That month OCS received a report that Katie and Drake had been in an altercation while Katie was holding infant Hattie. According to their caseworker, this incident "put a hold" on his efforts "to get things completed and to work towards that trial home visit." A secondary

worker, accompanied by her OCS mentor, traveled to the village to investigate this new report and met with the parents in the company of two state troopers. OCS created a home safety plan that excluded Drake from the home. Communication between OCS and the parents then became more difficult.

### F. Katie Relocates To Fairbanks.

By mid-March 2022 both parents had again relocated: Katie and Hattie to Fairbanks and Drake back to North Pole. Drake testified that he wanted Fairbanks-based, in-person counseling and told his Valdez counselor, who promised to bring it up with the caseworker. Drake acknowledged never having voiced this desire to the caseworker directly, but he said the caseworker never raised the idea with him either. Drake also testified that he had a hard time getting to appointments because he did not have a driver's license, so he used his longboard and had bought himself a bus pass. Drake said that he mentioned his lack of transportation to OCS workers and they offered him no help. The caseworker recalled Drake mentioning that he was taking the bus and catching rides, but he testified that Drake never said it was a problem or asked for assistance.

Katie also testified that she wanted to continue her required services while in Fairbanks and at some point asked OCS for a referral for classes at a local domestic violence shelter. According to Katie, she never received a response, though the record is not clear on this point.[4] She testified that OCS never offered to set up a substance abuse assessment or counseling for her in Fairbanks; she instead set up an assessment herself, and although OCS suggested counseling it gave her no further direction. She said that, like Drake, she did not receive transportation assistance but walked, paid for

---

[4]     Katie testified: "They told me they would give me a call back if they did get [a hold] of . . . them." But it is unclear whether "they" is OCS or the shelter. According to the caseworker, Katie requested a release of information. The caseworker asked another OCS staff member to provide it to Katie and believed that had been done.

bus rides, and got rides from friends. She testified that she struggled with cell phone access, as Drake paid for the service on both phones and could not always afford it.

OCS arranged for Katie to visit Jeb in person in Valdez in late April and for Drake to do the same in mid-May. During these trips, according to the primary caseworker, "communication was very open" and the parents were responsive to emails, texts, and phone calls. The trips also seemed to be successful; Drake described his visits as "awesome." While in Valdez Drake completed a behavioral health assessment OCS had set up for him and Katie completed a drug screening.

But after returning from Valdez the parents again became difficult to reach. In May OCS attempted to set up referrals for both parents for supervised visitation by video, but the parents never responded to OCS's efforts to contact them. Drake acknowledged his failure to stay in touch but testified that he could no longer pay for cell phone service and had no WiFi access in North Pole.

By the time of the hearing Drake was still living in North Pole but Katie and Hattie were back in the village.

### G. The Court Holds A Disposition Hearing.

The contested disposition hearing was held in Fairbanks in June 2022. The only matter at issue was whether OCS had made active efforts to reunify the family. Katie, Drake, the primary caseworker, the secondary worker, and another OCS worker[5] related the facts set out above.

After hearing the evidence, the superior court concluded that OCS had made active efforts. The court's oral findings emphasized the parents' lack of engagement, including their failure to keep OCS informed of their moves and their

---

[5] This witness testified that she oversaw the Interior Rural Investigations and Assessment Unit and supervised the worker who attempted to visit with Katie and Drake in April 2020. She testified about OCS's early involvement with the family and the secondary worker's assignment to the case in 2022.

failure to respond to OCS's attempts to contact them. It credited the parents' testimony that they struggled with phone service and transportation but observed that "if OCS isn't told, they can't address it." The court included in OCS's active efforts its attempts to engage the Tribe in case-planning and services; its attempts "to set up random UAs and counseling while the parents were in [the village] the first time";[6] its meeting with the parents in Fairbanks to create a safety plan;[7] its attempts to get Drake to reengage with his Valdez counselor; referrals for telephonic visitation; arranging parenting classes; speaking with the tribal first chief about air travel to the village; the secondary worker's trip to the village and creation of the in-home safety plan in February 2022; providing transportation for the in-person visitation in Valdez; and the secondary worker's persistent attempts to contact the parents throughout May 2022.

The court issued a written order summarizing its findings and conclusions and continuing OCS's custody of Jeb "for a period not to exceed two years." Katie and Drake both appealed the disposition order, and in January 2023 we issued a summary order reversing the court's "finding of active efforts required by 25 U.S.C. § 1912(d) (2018), and accordingly [the disposition order]." We stated that "[a]n explanation of [the] order [would] follow in due course"; this opinion provides that explanation.

---

[6] This finding appears to be erroneous, as there is no evidence that UAs were available in the village or that OCS attempted to schedule them while the parents were living there.

[7] The court also included as "an effort" a caseworker's travel to the village before discovering that the parents had relocated, but this appears to be based on a mistake of fact: the OCS supervisor testified that the caseworker "was unable to set up . . . air travel" to the village and then discovered the parents were in Fairbanks.

## III. STANDARD OF REVIEW

Whether OCS made "active efforts" toward reunification of the family of an Indian child pursuant to ICWA "is a mixed question of law and fact."[8] We review the superior court's factual findings "for clear error, reversing only if, after 'review of the entire record,' we are left 'with a definite and firm conviction that a mistake has been made.' "[9] "Whether the superior court's factual findings . . . satisfy ICWA is a question of law to which we apply our independent judgment."[10]

## IV. DISCUSSION

Any disposition order placing an Indian child outside the home requires a finding that OCS has made "active efforts . . . to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family."[11] "Active efforts means affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family."[12] ICWA's implementing regulations require that "to the maximum extent possible, active efforts should be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe"; should be conducted in partnership with the child, the child's family, and the Tribe; and should "be tailored to the facts and circumstances of the case."[13] We have explained that "OCS efforts are

---

[8] *Mona J.. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 560 (Alaska 2022) (quoting *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 526 (Alaska 2013)).

[9] *Id.* (quoting *Ronald H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 490 P.3d 357, 365 (Alaska 2021)).

[10] *Ronald H.*, 490 P.3d at 365.

[11] 25 U.S.C. § 1912(d); CINA Rule 17(c).

[12] 25 C.F.R. § 23.2 (2016).

[13] *Id.*

not active 'where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition,' but rather [are active] where the 'caseworker takes the client through the steps of the plan.' "[14]

Our conclusion that OCS failed to meet the active efforts standard at the disposition hearing rests on several related concerns, including OCS's failure to update Katie's and Drake's case plans, connect them with community resources, and diligently search for relative placements. We further conclude that the disposition order overemphasized the parents' failure to ask for specific kinds of help rather than placing the emphasis where it belonged: on OCS's "affirmative, active" efforts to engage the parents.[15]

### A. OCS's Limited Periods Of Active Efforts Were Not Adequate When Measured Over The Life Of The Case.

Active efforts are evaluated based on OCS's "involvement in its entirety."[16] If efforts have lapsed for a significant length of time, the court must assess whether "the period when active efforts were made compensated for the time during which they were not."[17]

---

[14] *Clark J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 483 P.3d 896, 901 (Alaska 2021) (quoting *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 271 (Alaska 2011)).

[15] *See Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 562 (Alaska 2022).

[16] *Lucy J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 244 P.3d 1099, 1114 (Alaska 2010) (quoting *Maisy W. v. State, Dep't of Heath & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1268 (Alaska 2008)).

[17] *Jacoby C. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, No. S-18147, 2022 WL 1162514, at *5 (Alaska Apr. 20, 2022); *see also Clark J.*, 483 P.3d at 903-04 (holding that active efforts directed toward mother earlier in case were insufficient to compensate for lack of effort toward father for rest of case).

The parties do not dispute that OCS's efforts from August 2020 to August 2021 failed to satisfy the active efforts standard. And there is very little evidence of renewed efforts from August to December 2021, when the Wasilla-based caseworker assumed responsibility. Efforts improved over the next five months, but we conclude that significant failures overshadow the positive steps made during that time.

### I. OCS failed to timely update Katie's and Drake's case plans and connect the parents with community resources.

Most significant to our analysis is OCS's failure to update Katie's and Drake's case plans to reflect resources available in the communities where they were living. Their case plans were created in October 2020, when they were living in Valdez, and were not reevaluated until January 2022. Even then the case plans were not revised to reflect how the parents' situations had significantly changed; at the disposition hearing in June the primary caseworker acknowledged that the case plans still "need[ed] to be updated" or were "about to need updating." Several reasons were given for this delay: the caseworker was waiting for the Valdez counselor to provide the results of Drake's May behavioral health assessment, or he was waiting for the secondary worker to complete her report on the safety of the home based on her February visit, or he was waiting for input from Drake himself.

One example of active efforts given by the BIA regulations is "identifying *community* resources . . . and actively assisting the Indian child's parents . . . in utilizing and accessing those resources."[18] To be effective, a case plan should make use of community resources whenever possible. And as confirmed by the caseworker's testimony, OCS policy requires that case plans be evaluated every six months to track progress and that they be updated when there is a "major event within a case."

---

[18] 25 C.F.R. § 23.2(8) (emphasis added).

Several "major events" could have been expected to prompt a reevaluation of Katie's and Drake's 2020 case plans long before January 2022. First, both parents left Valdez for the Interior in February 2021, putting significant distance between themselves and their child and between themselves and the resources on which their case plans relied. Five months later Katie and Drake had their second child, Hattie; significantly, after investigating a domestic violence report, evaluating the family situation, and creating a new safety plan for Hattie, OCS apparently saw no need to remove Hattie from Katie's care. But neither the move nor Hattie's birth prompted a reevaluation of the case plans.

The need to connect the parents to local resources to help them make progress was highlighted at the August 2021 hearing preceding the transfer of venue from Valdez to Fairbanks. Katie's attorney argued that "the court really needs to get this case up to Fairbanks, where both of the parents are located and where the services are being provided." She continued: "[T]he service providers that are in Valdez are very different than those up in Fairbanks. And so the family is not getting the benefit of having somebody with local knowledge." She argued that OCS would continue to fall short of the active efforts standard as long as the case remained in Valdez. Drake's attorney agreed: "[T]he case should get [to Fairbanks] . . . so that the case can be assigned to the appropriate people and the efforts could be made." The Tribe's attorney added, "[W]e all want this change because it will be the best way to get good services to the family." She explained, "Not only does that mean service provider knowledge, but also folks who live in Fairbanks and can do assessments of potential relative placements. It's been an ongoing struggle to get anyone to assess folks in [the village] or other relatives that aren't in the Valdez area as potential placements for [Jeb]."

The superior court expressly adopted this position in ordering an immediate transfer of venue: "[I]t's the court's opinion that getting the transfer done right away in order for them to start working with . . . whatever service providers they're

going to be working with for the remainder of the case . . . [is] in the parents' and the child and the family's best interests." The CINA case was therefore transferred from one court to another; yet ten months later, at the time of the disposition hearing, the case was being handled by the Wasilla-based caseworker whose normal caseload focused on Southcentral Alaska and the Aleutian Islands. The caseworker agreed that it would be beneficial to have a Fairbanks caseworker who could meet with the parents "[o]n case-planning activities," but he cited staffing and scheduling issues to explain why the case remained with him instead. These reasons, however compelling, cannot make up for a failure to update the case plans in order to reflect significant changes in the parents' circumstances and take advantage of available community resources.[19]

### 2. The evidence does not support a finding that OCS conducted a diligent search for relative placements.

The superior court also credited OCS with the effort of making a search for relative placements among Jeb's extended family. It was certainly proper for the court to consider this issue: BIA regulations defining "active efforts" include "[c]onducting or causing to be conducted a diligent search for the Indian child's extended family members, and contacting and consulting with extended family members to provide family structure and support for the Indian child and the Indian

---

[19] We note what appears to be another significant oversight in OCS's provision of services, though not well developed in the record. OCS policy provides that former foster youth up to age 21 are eligible for "financial, housing, counseling, employment, education, and other appropriate support services" through the Independent Living Services Delivery program; this support may include the assignment of an independent living specialist. ALASKA OFF. OF CHILD.'S SERVS., CHILD PROTECTIVE SERVS. MANUAL § 3.13.1 (2022). Katie was not quite 19 when Jeb was born, but there is no evidence OCS considered providing her this additional support. OCS argued that Katie had proven herself intransigent by running away while in foster care, but there is nothing to suggest that the services did not remain available to her as a parent and adult.

child's parents."[20]  But Drake and the Tribe both point to evidence suggesting that OCS did not in fact perform a diligent search for relative placements and that it was therefore error to credit OCS for the effort.

The primary caseworker acknowledged that he "personally did not initiate the relative search" but agreed, based on case file notes, that one had been conducted in April 2022, two months before the hearing.  Although uncertain, he appeared to concede that the search had been initiated by the Tribe and the results shared with OCS.  The search identified two potential relative placements "who expressed an interest" in addition to the one OCS had earlier considered and rejected; the primary caseworker was unaware of them until his cross-examination at the hearing.

Given this testimony, and the absence of other evidence on the issue, we agree that the record does not support a finding that OCS conducted a diligent search for relative placements.  And we observe that this shortcoming may be connected to the lack of an updated case plan incorporating local knowledge and community resources.  As noted above, the Tribe had observed in August 2021 that while Jeb "remain[ed] in nonfamily placement" in Valdez there was "an ongoing struggle to get anyone to assess folks in [the village] or other relatives that aren't in the Valdez area as potential placements."  Ten months later Jeb remained in Valdez despite the unexplored possibility of a relative placement closer to his parents.

### 3. OCS failed to meaningfully involve the Tribe in case planning and services.

The BIA regulations also require that "[t]o the maximum extent possible, active efforts should be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe and should be conducted

---

[20]    25 C.F.R. § 23.2(4).

in partnership with the Indian child and the Indian child's . . . Tribe."[21] As an example of active efforts, the regulations list "[o]ffering and employing all available and culturally appropriate family preservation strategies and facilitating the use of remedial and rehabilitative services provided by the child's Tribe."[22] The 2016 ICWA guidelines cite evidence that services adapted to the parent's cultural background tend to be more successful.[23]

Drake argues that there is no evidence of any effort to involve the Tribe in case planning and services prior to the involvement of the Wasilla-based caseworker over a year into the case, and that the superior court erred when it credited OCS for such efforts. The Tribe adds that to the extent OCS did reach out, it was only for logistical help, and not, as ICWA intends, as if the Tribe were a trusted partner capable of helping facilitate "cooperation toward a common goal of safe reunification in a culturally-competent way."

The record is less than clear on the extent to which OCS attempted to contact the Tribe and the extent to which the Tribe responded. We therefore cannot say that the court clearly erred when it found that the primary caseworker's calls to the Tribe's first chief and "multiple efforts to contact the [T]ribe" "were rarely responded to." But the only testimony about successful contacts during the life of the case concerned the primary caseworker's request for information about flights to the village, apparently early in 2022, and the first chief's participation in the February 2022 safety

---

[21]    *Id.* § 23.2.

[22]    *Id.* § 23.2(5).

[23]    *See* U.S. DEP'T OF THE INTERIOR, GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT (2016).

plan.[24] Some tribal involvement appears to have been entirely independent of OCS's efforts, such as when, according to Katie, she turned to the first chief for help finding a parenting class when OCS failed to give her a local referral.

We have determined that a tribe's involvement contributed to OCS's active efforts when OCS actively worked with the tribe, involved the tribe in case planning meetings, consulted the tribe on placements, and helped the parent access services through a tribal service provider.[25] Here, the evidence of OCS's attempts to involve the Tribe is slight. We conclude that it adds little if anything to OCS's "active efforts."

B. **The Disposition Order Placed Undue Emphasis On Drake's And Katie's Failures Of Communication.**

Recently, in *Mona J. v. State, Department of Health & Social Services, Office of Children's Services*, we emphasized that the "active efforts" analysis "turns primarily on OCS's actions, not on the parent's response."[26] Although there are

---

[24] The discussion of this issue in OCS's brief relies in part on evidence that was not before the superior court at disposition. Much of OCS's brief, in fact, cites evidence not admitted below. We have admonished OCS in the past for its reliance on appeal on documents it failed to properly submit at the trial court level, and we do so again here. *See Bill S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 976, 983 n.32 (Alaska 2019) ("On appeal, we review a trial court's decision in light of the evidence presented to that court." (citing *Chloe O. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 309 P.3d 850, 856 (Alaska 2013))); *Diego K. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 411 P.3d 622, 629-30 (Alaska 2018) (explaining that courts cannot consider evidence not properly admitted under Alaska Rules of Evidence).

[25] *Ronald H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 490 P.3d 357, 367-68 (Alaska 2021).

[26] 511 P.3d 553, 562 (Alaska 2022). *Mona J.* was published just four days before the disposition hearing at issue here. Counsel for the mother and counsel for the father both cited it in their closing arguments.

circumstances when the parents' actions are important to the analysis, "[a] parent's lack of cooperation or unwillingness to participate in treatment does not excuse OCS from making active efforts and proving that it has made them."[27] We also observed in *Mona J.* that "[w]hen a parent is unwilling to cooperate and OCS merely persists in the same actions it would have taken with a cooperative parent, OCS may be failing to engage in active efforts by not adjusting to the circumstances of the case."[28] A proper response would be "to attempt to overcome that noncooperation."[29]

Here, the superior court found that to the extent OCS failed to provide timely and appropriate services to Katie and Drake, it was largely due to two failures on the parents' part: first, their "moves back and forth" without letting OCS know, "making it very difficult for OCS to find out where the parents were so that they could offer more services"; and second, their failure to respond to OCS's "numerous communication attempts, whether phone, email, [or] text."

We note first the lack of record support for a finding that Katie's and Drake's failure to keep OCS up to date on their whereabouts hampered the provision of services. From the hearing testimony, the longest OCS remained uninformed of a move while actively attempting to contact the parents appears to have been several weeks, following the parents' move from the village to the Fairbanks area in mid-March 2022. There was a meeting of the parties on April 1, during which the need for Fairbanks-based services was discussed; at the latest, the secondary worker testified that she learned of the move when she was assigned to the case on April 19. There was no testimony that OCS tried to offer a particular service or make a particular referral but could not do so because it did not know where the parents were living.

---

[27] *Id.*

[28] *Id.* at 563.

[29] *Id.*

There is more record support for a finding that the parents were sometimes unresponsive to OCS's attempts to contact them; both parents admitted to communication difficulties. But again there is little evidence that this interfered with the provision of services, and what evidence does exist is largely limited to a relatively brief period immediately before the disposition hearing. The primary caseworker testified that although he believed there were communication difficulties before he assumed responsibility for the case in late December 2021, his knowledge of that period was "vague." Once assigned the case he "was able to make contact, do introductions," perform "a case plan evaluation to see where they were at, what they needed to do to move forward," and "start[] the process of trying to get the telephonic visitation back up." He testified that although it was sometime difficult to reach the parents by phone (which he recognized may have been due in part "to connectivity problems with their location"), Katie "was very active with email with [him]. [He had] lots of emails going back and forth with her, asking questions or sending pictures of [Jeb] . . . pretty open communication." At the same time Drake "was cooperative but somewhat difficult to get [a hold] of."

The caseworker's renewal of efforts in early 2022 was stalled by the domestic violence incident in the village in February, but both the primary caseworker and the secondary worker assigned to investigate the incident testified that the parents were cooperative during the investigation. The next evidence of either attempted or successful communication involves the parents' in-person visitation with Jeb in Valdez: Katie for three days in late April and Drake for three days in mid-May. The primary caseworker testified that "[d]uring that time, communication was very open . . . . They were responding to email, they were responding to text message and phone call." The visits were successful, and the parents were otherwise "engaging with the department" while in Valdez: Katie completed a drug screening and Drake a behavioral assessment.

It is the time between the Valdez visitation and the disposition hearing — a period of roughly a month or a month and a half — that was the focus of much of the testimony about OCS's inability to reach the parents, when the secondary worker, newly assigned to the case, described her unsuccessful attempts to contact both Katie and Drake by phone and in person.[30] But this represents a small fraction of this case's time line.

Quoting *Clark J. v. State, Department of Health & Social Services, Office of Children's Services*, OCS contends that its "failed attempts to contact the parent[s] may qualify as active efforts" because the parents' "conduct rendered provision of services practically impossible."[31] But in *Clark J.* the father actively avoided contact with OCS for two years because the mother had told him his involvement would "only make things harder."[32] In *D.A.M. v. State, Department of Health & Social Services, Office of Children's Services*, we upheld an active efforts finding when the father "was not simply reluctant to engage with some OCS services; he refused to contact caseworkers even when he knew that they were looking for him and that engagement was required to reunite with his son," successfully avoiding OCS "for years."[33]

Here, in contrast and despite some gaps, OCS was able to contact the parents and provide some services once it reactivated its efforts in early 2022. And there were areas in which OCS could have made progress without the parents' direct involvement, such as identifying local service providers for those areas in which it knew

---

[30]    We observe that this period covers the time both parents were attending their respective OCS-arranged visits to Valdez, a time when the primary caseworker testified "communication was very open" and both parents were responsive to emails, texts, and phone calls.

[31]    483 P.3d 896, 902 (Alaska 2021).

[32]    *Id.* at 898.

[33]    No. S-18241, 2022 WL 3907719, at *6, *8 (Alaska Aug. 31, 2022).

the parents needed help. OCS could also, consistent with *Mona J.*, have met the parents' inconsistent contact with active efforts to improve communications.

In sum, the evidence does not support a finding that OCS's efforts were sufficient because Katie and Drake thwarted its attempts to do more. OCS failed to meet the active efforts standard.

## V.   CONCLUSION

Consistent with our order of January 19, 2023, we REVERSE the disposition order and REMAND for further proceedings consistent with this opinion.