NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| ZEKE N. and JORDYN A., | ) |
| Appellants, | ) Supreme Court No. S-19250/S-19259 (consolidated) |
| v. | ) |
| STATE OF ALASKA, DEPARTMENT OF FAMILY AND COMMUNITY SERVICES, OFFICE OF CHILDREN'S SERVICES, | ) Superior Court No. 3AN- 19- 00528/529 /530 CN |
| Appellee. | ) MEMORANDUM OPINION AND JUDGMENT* |
| | ) No. 2131 – January 14, 2026 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Josie Garton, Judge.

Appearances: Michael L. Horowitz, Law Office of Michael Horowitz, Kingsley, Michigan, for Appellant, Zeke N. Chris Peloso, Peloso Law, Juneau, for Appellant, Jordyn A. Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, and Treg R. Taylor, Attorney General, Juneau, for Appellee. Paul F. McDermott, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian ad Litem.

Before: Carney, Chief Justice, and Borghesan, Henderson, Pate, and Oravec, Justices.

---

\*      Entered under Alaska Appellate Rule 214.

# I. INTRODUCTION

Zeke and Jordyn[1] appeal the superior court's order terminating parental rights to their three Indian children, as defined by the Indian Child Welfare Act (ICWA).[2] The Office of Children's Services (OCS) assumed emergency custody in 2019 due to the father's substance use and the mother's incarceration. Over the next five years, OCS offered case plans and services to reunify the family, but the parents engaged only sporadically. The superior court eventually terminated their rights, finding that OCS had satisfied its duty to provide active efforts to prevent the breakup of the Indian family. Both parents now appeal, claiming that OCS failed to provide the required active efforts to reunify their family. Seeing no error in the superior court's analysis, we affirm the court's termination order.

# II. FACTS AND PROCEEDINGS

## A. Facts

Zeke and Jordyn are the parents of Miles, Nigel, and Jonah. This is the third Child in Need of Aid (CINA) case involving the family. In 2016, Miles was born with substance withdrawal symptoms requiring hospital treatment. OCS initially took custody after Jordyn attempted to remove Miles from treatment. The case eventually was dismissed. In 2018, Jonah was born with substance withdrawal symptoms, and OCS took custody of all three children when Jordyn removed Jonah from the hospital against medical advice. The court found insufficient evidence to support removal and the children were returned to the parents and the case closed in May 2019.

This case arises from the third intervention by OCS, which occurred in August 2019 while Jordyn was incarcerated and Zeke and the children were living in a

---

[1]     We refer to all family members in this case pseudonymously.

[2]     All three children are "Indian children" as defined by the Indian Child Welfare Act, based on Zeke's affiliation with a tribe and Jordyn's affiliation with a different tribe. 25 U.S.C. § 1903(4). We refer to "the Tribe" rather than its proper name to protect the family's privacy.

tent along a river. Zeke appeared to be sleeping, leaving the very young children (ages 3, 2, and 11 months) alone and unsupervised near the water. Neighbors at the campsite were concerned when they were unable to revive Zeke and so they called the authorities. The state troopers arrived and found that the children were unsupervised, cold, unclean, and hungry with Miles wandering near the river. Troopers were able to revive Zeke, who prioritized recording the interaction instead of attending to his children; he also refused offers of assistance for the children or himself. OCS arrived, took the children into custody, and brought them to the hospital for medical attention. Jonah was later admitted for dehydration.

Following the August 2019 removal, the children were initially placed in non-relative foster homes because no relative placements were immediately available. OCS filed an emergency custody petition; the parents opposed it. Due to the COVID-19 pandemic and related protocols, the adjudication hearing was delayed and eventually took place over seven days from December 2020 through May 2021. In the meantime, as described below, OCS developed and updated case plans for both parents. The same caseworker was assigned throughout the proceedings.

Zeke initially did not respond to multiple efforts by OCS to engage him. Eventually, in January 2020, OCS and Zeke prepared a case plan focused on substance abuse, mental health, physical health, employment, and housing. The caseworker made direct referrals, offered joint calls to schedule appointments, delivered application paperwork to his home, provided transportation, and searched for providers with him online. Zeke agreed to services but failed to follow through, causing multiple referrals to be closed. He repeatedly refused help with housing applications and with reinstating his Medicaid, which he allowed to lapse. Zeke's refusal of assistance was often explicit. For example, regarding Medicaid, when the caseworker offered assistance to reinstate it so services could be paid for, Zeke declined, stating, "I got this, buddy." Zeke struggled to maintain consistent visitation, missing 11 out of 13 supervised visits at a visitation program by May 2020.

Jordyn's case plan focused on addressing substance abuse, mental health, and parenting skills. However, her engagement was complicated by significant periods of incarceration and extreme hostility. Jordyn was incarcerated for approximately 26 of the 46 months the case was active. OCS began case planning in 2019, collaborating with the prison's social worker, but Jordyn initially refused to sign releases and the subsequent COVID-19 lockdown prohibited external providers from entering the facility. In August 2020, she was transferred to a federal correctional institution, where services were nonexistent and visitation was hamstrung by strict protocols. Throughout these periods, Jordyn's progress was minimal; she was often verbally combative, opposed OCS's involvement, and created security concerns by threatening the caseworker. Jordyn was released from federal custody in early 2021.

In the summer of 2021, the children were placed with their paternal grandmother. In September, two years after removal, the court issued an amended adjudication order in which it found by a preponderance of the evidence that the children were in need of aid due to the incarceration of a parent, risk of (or actual) physical harm, neglect, and substance abuse.[3] During this time period, the parents were permitted in-person supervised visits with the children. Unbeknownst to the caseworker, Jordyn also had unsupervised, unauthorized visitation with the children.

In December, the caseworker arrived for an unscheduled home visit and observed Jordyn loading two of the children into a car. Jordyn reversed the car quickly, requiring the caseworker to jump out of the way, and Jordyn quickly left the area with the two children; the children were not returned. The third child was also missing from the foster home, and he was later recovered from Zeke's home.[4]

---

[3] AS 47.10.011(2), (6), (9), and (10), respectively.

[4] Later, after the child was placed in a new home, multiple tracking devices were found hidden in his belongings.

The other two children were located months later, in February 2022, after one of the children called the police because he was hungry. Officers found both parents barricaded inside a building with the children. After a lengthy standoff with law enforcement, and after Jordyn threatened the children while possessing a weapon, both parents ultimately surrendered.

Following her arrest, Jordyn remained incarcerated for much of the remainder of the case. While Jordyn was incarcerated, OCS referred her for in-house mental health and substance abuse assessments. Jordyn accessed medication-assisted substance abuse treatment, but faced long waitlists for other services. OCS attempted to facilitate visitation by scheduling video meetings, but OCS was not always successful due to administrative hurdles, the children's reluctance, and Jordyn's behavior.

Zeke was released from custody by the spring of 2022 and OCS resumed efforts to engage him. OCS facilitated supervised visitation and referred Zeke for mental health services and housing assistance, though Zeke frequently declined help with applications and failed to follow through with providers. Zeke completed a neuropsychological evaluation but failed to consistently engage in recommended counseling. His engagement wavered significantly depending on Jordyn's status; he often focused on her needs rather than his own case plan. Zeke eventually ceased visiting the children.

Throughout the case, while working with the parents, the OCS caseworker communicated consistently with Zeke's Tribe, which had intervened in the case. OCS provided the Tribe with copies of case plans and invited tribal representatives to case planning meetings, which the Tribe consistently attended. OCS and the Tribe collaborated on several efforts, including visiting Zeke's home together and identifying potential relative foster placements. OCS sent letters to relatives identified by the Tribe, but was not able to find a relative placement. Following the parents' unauthorized removal of the children from the paternal grandmother's home, OCS convened a meeting with the Tribe and the parties to explore any other potential relative

placements. OCS also adapted service referrals based on discussions with the Tribe, such as changing Zeke's substance abuse treatment provider.

## B.    Proceedings

In May of 2023, OCS petitioned for the termination of Zeke's and Jordyn's parental rights. The termination trial was scheduled for November of 2023. Both parents testified. The court also heard testimony from the OCS caseworker, five police officers, two foster placements, an expert witness for the state, a tribal representative (the cultural expert required by ICWA), and Jordyn's sister. At the close of the hearing, the superior court ordered the termination of both parents' parental rights.

The court found, by clear and convincing evidence, that the children were in need of aid on grounds of physical harm, neglect, and substance abuse,[5] and that the parents had not remedied the conduct or conditions that placed the children at substantial risk of harm. The court noted the children's in utero opiate exposure and subsequent withdrawal, the children's condition upon removal from Zeke at the campground, the parents' failure to meet the children's significant medical and general needs after taking them from their placement in 2022, and their presence during a standoff with law enforcement. The court determined that the parents had not meaningfully engaged in their case plans, demonstrated behavioral change, or maintained consistent visitation, additionally noting their history of reincarceration.

In discussing OCS's efforts, the court noted "the parents' extraordinary resistance" to those efforts. Nonetheless, the court found by clear and convincing evidence that OCS made active efforts directed at both the parents and the children.[6]

---

[5]    AS 47.10.011(6), (9), and (10).

[6]    AS 47.10.086; 25 U.S.C. § 1912(d). The court also found that the Department made both active and reasonable efforts in this case. "Active efforts" is the standard applicable in ICWA cases. 25 U.S.C. § 1912(d) We focus on the appropriate

The court found that OCS created and updated appropriate case plans, provided referrals for substance abuse treatment and housing, and secured funding for neuropsychological evaluations when insurance barriers arose. The court highlighted the caseworker's "countless offers of assistance" to help the parents complete applications and schedule appointments, as well as the agency's specific efforts to build rapport and overcome the parents' mistrust. Additionally, the court found OCS consistently engaged with the Tribe, incorporating its recommendations into case planning, and collaborated with prison staff to assist Jordyn during her incarceration. Finally, the court noted that OCS facilitated family contact and transportation, adapting its efforts to address safety concerns and the logistical challenges of incarceration.

Relying on the testimony of expert witnesses, the court ultimately found beyond a reasonable doubt that continued custody by the parents would likely result in serious emotional or physical harm and that termination of parental rights was in the children's best interest. The court observed that the children had been out of their parents' custody for nearly five years and were bonded to willing permanent placements, noting that they thrived without parental contact but experienced significant stress and behavioral regression following visits.

Zeke and Jordyn now appeal. Both parents contest the active efforts finding. For reasons below, we affirm the trial court's finding of active efforts.

## III. STANDARD OF REVIEW

Whether the agency made active efforts is a mixed question of fact and law.[7] Factual findings are reviewed for clear error,[8] and are only disturbed if we are

---

standard of effort in discussing this ICWA case. *See Kylie L. v. State, Dep't of Health & Soc. Servs.*, 407 P.3d 442, 452-53 (Alaska 2017) (examining effort required from OCS under the less stringent "reasonable efforts" standard applied in non-ICWA cases).

[7] *Ronan F. v. State, Dep't of Fam. & Cmty. Servs., Off. of Child.'s Servs.*, 539 P.3d 507, 514 (Alaska 2023).

[8] *Id.*

left with "a definite and firm conviction that a mistake has been made."[9]  Whether ICWA requirements are satisfied by factual findings is a question of law that we review de novo.[10]

## IV.   DISCUSSION

Zeke and Jordyn argue that the superior court erred in finding that OCS met its active efforts burden under ICWA.  In order to terminate parental rights to an Indian child, the superior court must find that OCS has made "active efforts" to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family, and those efforts have proven unsuccessful.[11]  When deciding whether OCS's efforts are active, we must evaluate the agency's efforts in their entirety, considering all of the services provided to the family.[12]  This does not excuse "extreme" or "egregious" failures.[13]  While "perfection is not the standard," OCS must be "affirmative, active, thorough, and timely" with efforts "intended primarily to maintain or reunite an Indian child with his or her family."[14]  Its efforts should therefore "increase

---

**9**      *Ronald H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 490 P.3d 357, 365 (Alaska 2021) (quoting *Jon S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 212 P.3d 756, 761 (Alaska 2009)) (internal quotation marks omitted).

**10**      *Id.*

**11**      *Lucy J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 244 P.3d 1099, 1114 (Alaska 2010) (quoting 25 U.S.C. § 1912(d)).

**12**      *See Doe v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 272 P.3d 1014, 1021 (Alaska 2012) (citing *Jon S.*, 212 P.3d 763-64 (Alaska 2009)); *Ronald H.*, 490 P.3d at 366.

**13**      *Clark J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 483 P.3d 896, 904 (Alaska 2021).

**14**      *Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 566 (Alaska 2022); *see also* 25 C.F.R. § 23.2.

the likelihood that families will be reunified, or at least reduce the amount of time it takes to determine whether reunification will be possible."[15]

ICWA requires that active efforts "be tailored to the facts and circumstances of the case."[16] Zeke argues that his lack of trust was a barrier that OCS did not work to overcome. Jordyn argues that OCS did not make active efforts to overcome her incarceration and noncooperation. She also argues that OCS failed to engage with the Tribe. We address each parent's arguments in turn.

## A. The Superior Court Did Not Err In Determining OCS Made Active Efforts Toward Zeke Despite His Noncooperation And Mistrust.

Zeke argues that OCS failed to engage in active efforts because it did not address his fundamental "barrier of mistrust" toward the agency. He contends that without first establishing trust, there was no realistic possibility that he could meaningfully engage with the services offered to him.

Parental noncooperation "will necessarily affect the kinds of efforts OCS is able to make toward reunification and in that way affects a court's analysis of whether OCS has satisfied its active efforts burden."[17] Parental noncooperation is not a uniform concept; it can range from a passive refusal to engage in treatment to overt threats of harm against agency officials.[18] OCS must tailor its efforts to address the specific causes of a parent's noncooperation.[19] Simply treating an uncooperative parent the

---

[15] *Anton K. v. Dep't of Fam. & Cmty. Servs., Off. of Child.'s Servs.*, 554 P.3d 456, 466 (Alaska 2024) quoting *Jon S.*, 212 P.3d at 769 (Christen, J., dissenting in part)) (internal quotation marks omitted).

[16] *Id.* at 465-66 (quoting 25 C.F.R. § 23.2).

[17] *Mona J.*, 511 P.3d at 563.

[18] *Id.* at 563-64.

[19] *See Sandy B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 216 P.3d 1180, 1188 (Alaska 2009).

same as a cooperative one will not likely fulfill OCS's duty to make active efforts.[20] However, we may consider a parent's demonstrated unwillingness to engage when determining whether OCS's efforts satisfy the ICWA standard.[21]

Zeke does not dispute that he was often noncooperative or nonresponsive. Nonetheless, the record demonstrates that OCS undertook specific actions to overcome Zeke's resistance and build a working relationship. A single caseworker handled the case for nearly its entire five-year duration, providing a consistency that was itself an effort to build rapport. The caseworker involved Zeke in his case plan by changing substance abuse providers to match Zeke's preference and pursuing a neuropsychological exam to better understand his needs. The caseworker provided practical, hands-on assistance, such as giving Zeke a bus pass, driving intake paperwork to his house for him, and offering to make joint calls to providers to set up appointments. Additionally, the caseworker repeatedly asked Zeke to identify any barriers he was facing, and Zeke consistently denied any existed and declined assistance. It was not until the final day of the termination trial, nearly five years into the CINA case, that Zeke identified distrust as a potential barrier. The court did not clearly err when it determined that by the time of this assertion, OCS had already tailored its efforts to overcome Zeke's noncooperation.

OCS must *attempt* to overcome noncooperation but it is not required to succeed in building trust.[22] Here, OCS provided sustained, tailored, and practical

---

**20**  *Mona J.*, 511 P.3d at 564-65.

**21**  *See, e.g.*, *id.* at 563-64; *see also Anton K. v. State, Dep't of Fam. & Cmty. Servs., Off. of Child.'s Servs.*, 554 P.3d 456, 466 (Alaska 2024); *Josh L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 276 P.3d 457, 462 (Alaska 2012); *Wilson W. v. State*, 185 P.3d 94, 101 (Alaska 2008).

**22**  *Bill S. v. State, Dep't of Health and Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 976, 983 (Alaska 2019); *Mona J.*, 511 P.3d at 562.

assistance. We affirm the superior court's determination that OCS made active efforts to reunify Zeke with his children.

**B. The Superior Court Did Not Err In Determining OCS Made Active Efforts Toward Jordyn Despite Her Incarceration.**

After the children were removed, Jordyn was incarcerated repeatedly and for prolonged periods of time. Jordyn argues that OCS failed to provide her with meaningful services while incarcerated, contending that her case plan included goals, such as obtaining housing and a neurological assessment, that were "literally impossible" for her to complete. She asserts that simply creating a case plan with impossible goals does not satisfy the active efforts standard. She also argues that the superior court improperly excused OCS's alleged failures by blaming parental resistance, and that OCS failed to meaningfully engage with the children's Tribe. The record does not support Jordyn's claims.

OCS must take into account the duration of incarceration and services that are available and tailor its efforts to address the practical challenges of providing resources within correctional facilities.[23] ICWA requires that OCS assist the parent in "accessing or developing" resources,[24] but the "circumstances surrounding a parent's incarceration may have a direct bearing on what active remedial efforts are possible."[25] Limitations imposed by state and federal prison authorities were outside OCS's control, but OCS did not cease its efforts. The caseworker repeatedly engaged with Jordyn in prison, collaborated with prison staff, confirmed the unavailability of certain external services due to pandemic restrictions, and helped enroll Jordyn in available internal

---

[23] *Dashiell R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 222 P.3d 841, 849 (Alaska 2009).

[24] 25 C.F.R. § 23.2.

[25] *Anton K.*, 554 P.3d at 466 (quoting *A.M. v. State*, 891 P.2d 815, 827 (Alaska 1995)) (internal quotation marks omitted).

programs. Jordyn received medication-assisted treatment and was eventually assessed and placed on waitlists for further treatment while incarcerated.

In addition to coordinating services to the extent possible, OCS made consistent efforts to facilitate visitation despite the restrictive environment. The caseworker coordinated with the prison social worker to bring the children in for video monitor visits and attempted to troubleshoot technical issues with video when Jordyn was transferred to federal custody. When the facility implemented new security policies, the caseworker proactively sent the children's birth certificates to the prison to ensure Jordyn could be placed on the visitation schedule. To maintain the parent-child bond during gaps in contact, the caseworker also sent photographs of the children to Jordyn.

We do not review OCS's efforts toward an incarcerated parent in isolation; rather, we view the agency's involvement in its entirety, including efforts made to support the family unit as a whole.[26] In addition to OCS's efforts toward Jordyn directly, we consider OCS's extensive efforts toward the children's father, its collaboration with the Tribe, and its work to find relative placements.[27]

While Jordyn does not address the adequacy of OCS's efforts with Zeke or other family members, she asserts that OCS failed to work with the Tribe. Jordyn claims that the tribal representative testified that communication coming from OCS was "difficult" and "adverse," with "a lot of challenges." This appears to be a misreading of the record. The testimony cited by Jordyn instead reflects that communication between the Tribe and the parents was contentious and soured over the course of the case.[28] In contrast, the record shows a consistent partnership between OCS and the

---

[26]    *See id.* at 466-67.

[27]    *Id.*

[28]    In fact, in 2023, the OCS caseworker uncovered that Jordyn impersonated a tribal representative in emails to OCS.

Tribe, including joint home visits, collaborative case planning, and discussions about potential relative placements. Indeed, the Tribe's cultural expert testified that OCS had "done a very good job in providing active efforts to both parents." The superior court's finding that OCS meaningfully engaged the Tribe is fully supported by the record.

Jordyn also argues that the superior court excused insufficient OCS efforts because of her resistance. But a parent's noncooperation appropriately may influence the court's analysis by affecting "what actions qualify as active efforts."[29] The court here properly analyzed whether OCS's efforts were "active" in the face of Jordyn's noncooperation, which was extreme. Jordyn absconded with two of the children and kept them for months, only surrendering them after an armed standoff with police. Despite this conduct and hostility, OCS retained the same caseworker throughout, persistently engaged with Jordyn, arranged for the services she could access during incarceration, worked with the Tribe, case planned with Zeke and sought potential other family placements. Indeed, even after Jordyn was incarcerated for charges stemming from removing the children from the foster placement, OCS made arrangements for visitation between Jordyn and her children. The court correctly evaluated OCS's actions within this context.

We affirm the superior court's determination that OCS made active efforts despite Jordyn's limited access to services while incarcerated and despite her extreme resistance.

## V.    CONCLUSION

For the foregoing reasons, we AFFIRM the superior court's order terminating the parental rights of Zeke and Jordyn.

---

[29]    *Mona J. v. Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 562-63.